IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**JAMES C. VANHOOSE,**                    Case 5:14 CV 708

     Plaintiff,

     v.                                              Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

     Defendant.                            MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Plaintiff James VanHoose filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision to deny supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. § 1383(c). The parties consented to the exercise of jurisdiction by the undersigned in accordance with Local Rule 72.2(b)(1). (Non-document entry dated June 23, 2014). For the reasons stated below, the Commissioner's decision is affirmed.

### PROCEDURAL BACKGROUND

Plaintiff had a prior claim for SSI and disability insurance benefits filed in 2008 that was denied after a hearing by an ALJ in August 2010. (Tr. 87-88). The ALJ found Plaintiff had the severe impairments of lung disease, seizure disorder, and depression but was not disabled. (Tr. 178-90).

Plaintiff filed for SSI on January 27, 2011, alleging a disability onset date of date of April 2, 2007. (Tr. 196-97). Plaintiff applied for benefits due to major depressive disorder, partial hearing loss in both ears, lung disease, emphysema, vertigo, and epilepsy. (Tr. 196-97). His

claim was denied initially (Tr. 196-212) and upon reconsideration (Tr. 214-27). Plaintiff requested a hearing before an administrative law judge ("ALJ") on August 12, 2011. (Tr. 251). Plaintiff, represented by counsel, and a vocational expert ("VE") testified at a hearing before the ALJ on November 8, 2012, after which the ALJ found Plaintiff not disabled. (Tr. 65, 84-126). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981. Plaintiff filed the instant action on April 1, 2014. (Doc. 1).

## FACTUAL BACKGROUND

### *Personal Background and Testimony*

Plaintiff was born on September 23, 1971 and was 41 years old on the date of hearing. (Tr. 92). He received his Bachelor's degree in Criminal Justice in 2010, after about three years of courses at an online university. (Tr. 94). Plaintiff had two children age twelve and nineteen but neither of them live with him. (Tr. 92-93). He did not have a driver's license though he used to have one; his girlfriend brought him to the hearing. (Tr. 93-94). He has prior work history as a line cook, saute cook, and sous chef, all of which he learned to do on the job. (Tr. 95-96).

Over the last five years, a typical day for Plaintiff included sitting in bed, watching TV, listening to music, trying to read or write, but mainly just sitting there and thinking. (Tr. 102-03). Recently, an impending eviction, financial problems, relationship issues, and his dog dying had made his depression worse.  (Tr. 103). He stated he usually watched two to three shows at one time because he was frequently bored but TV was only a way to pass the time; it did not make him feel better. (Tr. 104). Plaintiff stated his girlfriend did the household chores and he only bathed once a week, because that was all he could motivate himself to do. (Tr. 107). He stated he talked on the phone with his mother, son, and three long-time friends, and saw his girlfriend

2

daily. (Tr. 327). He said he could get along with all these people and the general public but preferred to avoid outside contact. (Tr. 328). Previously, Plaintiff liked to go to movies and he used to read a lot more. (Tr. 108). While he was in college he spent approximately two to three hours a day on his classes, but mainly would wait until Sunday to complete all his work, and he would spend the whole day on it. (Tr. 109).

Plaintiff reported his hearing, seizures, breathing, and depression all made it difficult to work but the seizures were the biggest impediment. (Tr. 96-97). He said his medication, which he took twice a day and resulted in no side effects and reduced the number of seizures but did not control their occurrence. (Tr. 97-98). Next, Plaintiff reported his breathing as an impediment because he was often out of breath, especially when using stairs and in warm weather. (Tr. 98). Plaintiff's shortness of breath was the result of lung resection, COPD, and emphysema. (Tr. 149-50). He also admitted he smoked about a pack and a half to two packs a day, and that the stress made it difficult to quit. (Tr. 154). He reported that he would probably be on oxygen within the next couple of years but the ALJ noted he had only a mild airway obstruction. (Tr. 159-60).

He also stated his depression "dictated [his] life"; there were times when he would only get out of bed to use the bathroom. (Tr. 99). He said it rendered him functionless and cost him relationships because he was antisocial. (Tr. 99). He also reported erratic sleeping mostly caused by his mental issues. (Tr. 106). Plaintiff described his hearing loss as complete in his right ear and stated he did not like to use the telephone, and often asked his girlfriend to make calls for him. (Tr. 100). He said he also constantly had ringing in his ears which he described as bell ringing, military troops marching, or crickets at night. (Tr. 100).

3

Plaintiff said he did not receive treatment for his seizures, hearing, or breathing problems because he did not have insurance or income. (Tr. 101). However, he received his medications for epilepsy and breathing through indigency programs. (Tr. 102).

***Relevant Medical Evidence***

Plaintiff was diagnosed with epilepsy in 2000 when he presented at the hospital with a grand mal seizure.[1] (Tr. 46). He described the seizures as beginning with an aura and tingling after which he loses awareness; typically followed by lip-smacking, picking at his clothes, walking in circles, and at times even semi-purposeful tasks. (Tr. 46). It is reported Plaintiff can speak and answer questions, but does not make sense; the seizure can last up to 45 minutes. (Tr. 46). Plaintiff stated his complex partial seizures[2] occur about three to four times per month and he has general convulsive seizures about twice a year. (Tr. 46). He reported his episodes are often precipitated by stress. (Tr. 46).

Plaintiff had a pulmonary function test in February 2010, where it was noted he had a moderate large airway obstruction but his voluntary ventilation levels could be "underestimated by patient effort." (Tr. 385). These results were similar to those from a pulmonary function test administered in 2007. (Tr. 389).

In May 2010, Plaintiff was seen by his primary care physician Morgan Koepke, M.D., and reported his stress levels were "out of control" and he had had two seizures within 30 minutes of each other. (Tr. 446). Plaintiff stated he did not want to quit smoking because there was "too much stress" in his life. (Tr. 447). He also reported social alcohol and marijuana use,

---

1. A grand mal seizure is a symptomatic form of epilepsy often preceded by an aura; characterized by loss of consciousness with generalized tonic-clonic seizures. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 1845 (Anne Marie Block et al. eds., 31st ed. 2007).
2. Complex partial seizures result from temporal lobe epilepsy and are also called psychomotor seizures. *Id.*

most recently as February 2010. (Tr. 447). Dr. Koepke observed Plaintiff continued to be pleasant, alert, and oriented and his lungs were clear to auscultation (Tr. 448, 452, 456) but expressed concern over his black-outs and explained she did not believe them to be epileptic episodes but rather the result of psychosis (Tr. 448, 539).

On June 2, 2010, Plaintiff saw Ear, Nose, and Throat ("ENT") specialist, Steven Kutnick, M.D., who diagnosed Plaintiff with chronic otitis media with possible cholesteatoma in the right ear. (Tr. 429). In July 2010, Plaintiff went to the ER for shortness of breath but a chest x-ray and lung observations were clear, the doctor opined it was symptom of musculosketal issues. (Tr. 393, 398, 407). In October 2010, Plaintiff saw Michael Wehmann, M.D., where he reported feeling well overall and his COPD was "greatly improved". (Tr. 438). He continued to report seizures lasting up to 45 minutes where he performed acts he had no memory of upon regaining consciousness but he had not had a grand mal seizure in about six months. (Tr. 438). Dr. Wehmann noted Plaintiff's lungs had good air movement and no rales or rhonchi, an improvement over his last visit. (Tr. 484, 488).

On November 11, 2010, Plaintiff saw Brian Cady, D.O., who reported Plaintiff was clean, casually groomed, with clear, coherent speech, no suicidal or homicidal ideations, cognitively intact, good judgment and insight, with good sleep and appetite. (Tr. 432). He also reported Plaintiff's "amnesia appear[s] to [be] fictitious to build a case for disability or to avoid responsibility for substance induced impulsivity." (Tr. 432). Similarly, at one point at a medication management session it was commented "client's diagnoses of seizures is and has been quite vague/unsubstantiated to this point" (Tr. 534).

Plaintiff began treating at Portage Path Behavioral Health in June 2009, mainly seeing Blaine Muehlbauer, LPCC, for counseling. (Tr. 588). He continued to be seen there for the next

three years where it was generally reported some progress was being made. (*E.g.,* Tr. 521, 541, 554, 579, 710, 726). At these sessions Plaintiff consistently reported with dysphoric or neutral moods with congruent affect (Tr. 516, 521, 523, 525, 529, 530, 534, 538, 540, 542, 544, 548, 553, 575, 577, 583, 693, 705). However, it was also noted that he was alert and oriented, dressed appropriately, and adequately groomed with normal speech. (Tr. 516, 518 521, 523, 525, 529, 530, 534, 538, 540, 542, 544, 548, 557, 562, 568, 575, 577, 583, 621, 679, 685, 690, 710).

While Plaintiff commonly reported being depressed (Tr. 518, 529, 538, 539, 544, 680, 685, 688, 705, 714, 719, 726) in many of his sessions it was observed he was pleasant, cooperative, and engaged (Tr. 547, 557, 562, 568, 572, 575, 583, 588, 679, 710, 728). It was consistently noted that he was logical, goal-oriented, and future thinking (Tr. 518, 529, 534, 538, 547, 557, 562, 568, 572, 575, 577, 621, 690, 710, 712) with fair insight and judgment (Tr. 518, 547, 557, 562, 569, 572, 575, 577, 621, 690, 705, 712, 719) and intact cognition (Tr. 518, 529, 534, 538, 547, 557, 562, 569, 572, 575, 577, 621, 690, 705, 710, 712, 719, 726). In fact, Plaintiff had written a lengthy rebuttal letter regarding his denial of disability and reported receiving straight A's in his online courses. (Tr. 539, 562, 568). Plaintiff was diagnosed with major depressive disorder, recurrent, moderate and substance abuse dependence in sustained partial remission. (Tr. 667). He was assigned a Global Assessment of Functioning ("GAF") score of 52.[3] (Tr. 667).

Plaintiff was seen at Akron General Hospital in July 2011 after his neighbors found him on his front steps unable to answer any questions. (Tr. 669). He stated he was out walking his

---

3. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (DSM-IV-TR). A GAF score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* at 34.

dog and did not remember anything after that. (Tr. 669). A CT scan was done and showed no evidence of acute process but did show a left sphenoid calvarial lesion. (Tr. 669). All other physical findings were normal on examination. (Tr. 669). At a follow-up in November 2011, Plaintiff reported seizures and flushing but again his physical examination was normal. (Tr. 700).

On June 13, 2012, Plaintiff saw Tricia Bedrick, D.O., for hearing loss, emphysema, and ankle/back pain. (Tr. 697). Dr. Bedrick observed Plaintiff was not in acute distress, all physical findings were normal, and he was in a pleasant mood. (Tr. 698). Later that month, Plaintiff returned to Akron General complaining of constant shortness of breath and cough. (Tr. 736). Upon physical examination there was no respiratory distress, his lungs were clear, he was alert and oriented, and spoke in full sentences. (Tr. 737, 745). He was diagnosed with exacerbation of his COPD by bronchitis and discharged with medication. (Tr. 737).

In September 2012, Plaintiff returned to Dr. Bedrick for seizures and swelling in his left ankle. (Tr. 746). Upon examination, all physical findings were normal. (Tr. 746). However, she referred him to a neurologist for seizure management. (Tr. 747). In October, Plaintiff saw Meredith Violet, D.O., who assessed depression as his primary ailment, but also shortness of breath, chest pain, and unspecified seizures. (Tr. 769). Dr. Violet commented she "[w]ill see [patient] back closely after his hearing since likely he will not be granted disability due to his conditions." (Tr. 769).

In March 2013, Plaintiff was hospitalized for observations relating to complex partial seizures, while there he had two episodes noted by lip-smacking, automatism, and unresponsiveness lasting for about two minutes a piece. (Tr. 51). In May, psychologist Phil Scozzaro, Ph.D., of Portage Path Behavioral Health noted Plaintiff was stressed and depressed "despite counseling, medication and some support from his family." (Tr. 35). Later in the year,

he underwent surgery to remove a cholesteatoma from his right-side middle ear and mastoid.[4] (Tr. 30). An audiogram at this consultation showed conductive hearing loss on his right-side. (Tr. 30). Plaintiff was then hospitalized in August 2013 to undergo a left temporal craniotomy and an anterior temporal lobectomy to repair an encephalocele and improve his epilepsy.[5] (Tr. 12, 15).

*Opinion Evidence*

In April 2011, a mental status questionnaire was completed by psychiatrist, A. Monticola, M.D., who reported Plaintiff generally had decent grooming and hygiene, dressed appropriately for the seasons, had normal and goal-oriented speech, depressed mood, anxiety regarding his financial situation, no thought disorders, was oriented to person, place, and time, had fair to poor concentration, moderate to significant memory impairment, average intellect, good insight, and fair judgment. (Tr. 513).

On July 26, 2012, Mr. Muehlbauer completed a mental status questionnaire regarding Plaintiff. (Tr. 733-34). He concluded that although Plaintiff could understand and remember short, simple instructions he could not remember work procedures or detailed instructions. (Tr. 733). Nor would Plaintiff be able to maintain attention and concentration, perform activities on a schedule, adapt to workplace changes, or complete a normal workday or workweek without psychological interruptions. (Tr. 733-34). Furthermore, he was noticeably impaired in his ability to interact with coworkers, supervisors, and the general public as well as in his ability to maintain socially appropriate behavior, neatness, and cleanliness. (Tr. 734). Overall, Mr.

---

4. A cholesteatoma is a cyst-like mass or benign tumor commonly found in middle ear and mastoid region secondary to trauma or infection that heals improperly. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

5. An encephalocele is a hernia of part of the brain and meninges, the three membranes that envelop the brain and spinal cord, through a cranial defect; it can be congenital, traumatic, or postoperative. *Id.*

Muehlbauer opined Plaintiff's "strong sense of pessimism" and his significant medical problems exacerbated his depression. (Tr. 734).

Mr. Muehlbauer also co-authored a letter with Judith Stanovic, PMHCNS, in advocacy of Plaintiff's claims of disability. (Tr. 750). They concluded Plaintiff was unable to work because his "depression persists at a significant level" and this severely limits his ability to work and function. (Tr. 750).

In October 2012, Meredith Violet, D.O., restricted Plaintiff's ability to lift or carry items and stand or walk for any significant period of time due to shortness of breath and COPD although he would be able to sit with no restrictions. (Tr. 766). She observed Plaintiff could occasionally climb, balance, stoop, crouch, or kneel but these restrictions were based on Plaintiff's complaints of shortness of breath, not on any objective findings. (Tr. 767). Furthermore, Plaintiff had no restrictions in reaching, handling, feeling, hearing, or speaking but could not push or pull, or be around dust or fumes. (Tr. 767). She also opined Plaintiff would be off task 25% of the time or more because of his depression and absent about three days per month. (Tr. 767).

*State Agency Examiners*

After a review of the record upon initial determination and reconsideration, Karla Voyten, Ph.D. and Ermias Seleshi, M.D., concluded Plaintiff had mild restrictions in daily living and social functioning and moderate difficulties in maintaining concentration, persistence, and pace. (Tr. 205, 221, 225-26). Leslie Green, M.D., and Diane Manos, M.D., also concluded Plaintiff was capable of work, however they both indicated multiple restrictions relating to Plaintiff's exertional limitations such as only occasionally lifting and walking, no climbing ladders, and face to face communication. (Tr. 207-08, 223-24).

*Consultative Examinations*

At a consultative physical examination in May 2011 with Yolanda Duncan M.D., it was reported Plaintiff had normal muscle strength and range of motion in all areas with no manipulative or fingering abnormalities. (Tr. 591-94). Plaintiff reported difficulties upon exertion and Dr. Duncan adopted his estimations, i.e. walking about 200 feet, climbing one to two flights of stairs, or standing for up to one hour. (Tr. 595, 597). She also reported his hearing and speech were normal and that he should have no difficulty with following commands. (Tr. 597). Plaintiff also submitted to a pulmonary function study where it was found Plaintiff had only mild restrictions in pulmonary function that were not improved by the usage of a bronchodilator. (Tr. 601, 603).

Plaintiff was seen by Joseph Yut, M.D., for a consultative examination regarding his alleged hearing loss in May 2011. (Tr. 616). Dr. Yut concluded he had "moderately severe bilateral, largely sensori-neural hearing loss" yet his free field speech discrimination was "quite good and it appears that he needs no rehabilitation for his hearing." (Tr. 616).

Also in May 2011, Plaintiff underwent a psychological consultative examination with E.M. Bard, Ph.D. (Tr. 609). Plaintiff reported ongoing depression and social isolation but also admitted he had a great relationship with his mother and girlfriend and still had three close friends in the community. (Tr. 611). He stated he was capable of handling his finances, reading and comprehending the newspaper, making appointments, telling time, reading a recipe, operating a computer, and managing his own mail. (Tr. 612). Plaintiff stated he often did not get dressed but that he independently handled his own hygiene, grooming, and meal preparation. (Tr. 612). He had also been taking care of an eight month old puppy but got winded when walking him. (Tr. 611). He reported enjoying sports and playing computer games but had the subjective

perception that his memory was bad, even though he remembered recipes from when he worked as a cook. (Tr. 611-12).

Dr. Bard observed Plaintiff was unkempt, with relevant, coherent speech, and an irritable but cooperative mood. (Tr. 612). Plaintiff seemed upset that others were receiving social security and not himself and noted he felt "slow, unmotivated, worthless, [and] I'm not happy to be awake." (Tr. 612). Plaintiff could not recall the location of the visit but did count correctly backwards by serial seven, copy a geometric design, write a nine word sentence, recall his social security number backwards and forwards, and recall two recent major media events; based on this Dr. Bard found Plaintiff had intellectual ability within the normal range. (Tr. 612).

Dr. Bard found Plaintiff was competent in understanding, remembering, and carrying out instructions and had the ability to maintain attention, concentration, persistence, and pace. (Tr. 613-14). He also reported that while Plaintiff appeared to be self-isolating there was evidence that he could interact with others, as he did with his girlfriend and mental health center. (Tr. 614). Dr. Bard suggested Plaintiff may be exaggerating his depression symptoms and memory and comprehension difficulties because of inconsistencies in the interview. (Tr. 613). However, Dr. Bard opined that subjectively Plaintiff would have difficulty dealing with pressures in a competitive work setting because of his depression. (Tr. 614). He assigned him a GAF score of 51. (Tr. 613).

### VE Testimony and ALJ Decision

The ALJ posed a hypothetical individual of Plaintiff's age, education, and work experience who could perform light work, except he could occasionally climb ramps or stairs but never ladders, ropes, or scaffolds and needed to avoid an environment with extreme heat, smoke, dust, fumes, gases, or other hazards. (Tr. 117). The individual could not drive or use a telephone,

was limited to simple, routine tasks, needed to avoid loud and excessive noise, and needed to communicate face to face with people. (Tr. 117). The VE testified Plaintiff could not perform his prior work but that other jobs did exist such as sales clerk, mail clerk, and cafeteria attendant. (Tr. 118).

In a second hypothetical the ALJ further restricted the individual to work completed in a static environment with no fast pace or production quotas, with infrequent changes, and those changes that did occur could be learned in 30 days. (Tr. 119). He also could not be responsible for the health or safety of others and could only have occasional interaction with the general public. (Tr. 119). The VE testified this individual could still be a mail clerk, cafeteria attendant, and also added assembler of electronic components. (Tr. 119). The ALJ again restricted the contact with others to only superficial interaction with co-workers and no contact with the general public. (Tr. 119-20). The VE stated the same jobs existed with this additional restriction. (Tr. 120). She also testified that a person off-task more than 10% of the time and absent more than twice a month would not be employable. (Tr. 120).

Plaintiff's counsel hypothesized an individual who can sit for eight hours a day but only stand for a total of one hour, can only walk 200 feet before stopping, could only climb one to two flights of stairs per day, and would be off-task 15% of the time. (Tr. 122). The VE testified that this person could perform the jobs of mail clerk, cafeteria attendant, and electronics assembler, but there could be an issue with maintainability. (Tr. 122). She further stated that even if reduced to sedentary work the physical restrictions were not preclusive but the off-task percentage was too high for employment. (Tr. 123).

In December 2012, the ALJ found Plaintiff had the severe impairments of depressive disorder, partial bilateral hearing loss, emphysema/lung disease, status post lobectomy, and

seizure disorder; but these severe impairments did not meet or medically equal any listed impairment. (Tr. 67-69). The ALJ then found Plaintiff had the RFC to perform light work except that Plaintiff may occasionally climb ramps and stairs, but may never climb ladders, ropes, or scaffolds. (Tr. 69). Plaintiff also had to avoid work environments with extreme heat, smoke, dust, fumes, gases, dangerous machinery, and unprotected heights. (Tr. 69). He could not drive or use the telephone, had to avoid exposure to loud and excessive noise, and needs to communicate face to face with others. (Tr. 69). He was further limited to simple, routine tasks that can be learned in 30 days or less in a static work environment with no fast-paced or time quotas. (Tr. 69). Lastly, he could not be responsible for the health or safety of others and could only have occasional interaction with others. (Tr. 69).

Based on the VE testimony, the ALJ found Plaintiff could perform work as a mail clerk, cafeteria attendant, or assembler. (Tr. 77).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court

cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and

14

meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

Plaintiff argues the ALJ erred because he (1) did not give appropriate weight to the medical sources; (2) erred in his credibility determination of Plaintiff; and (3) did not meet his burden at Step Five. (Doc. 17, at 11-18). Each argument will be addressed in turn.

### *Weight of Medical Opinions*

Plaintiff argues the ALJ did not give the appropriate weight to the treating source opinion of Dr. Violet but also inappropriately weighed the opinions of state agency examiners, consultative examiners, and other source opinions. (Doc. 17, at 11-15).

*Treating Physician Rule*

Under the regulations, a "treating source" includes physicians, psychologists, or "other acceptable medical source[s]" who provide, or have provided, medical treatment or evaluation and who have, or have had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 416.902. An ongoing treatment relationship will exist when "medical evidence establishes that [claimant] see[s], or ha[s] seen, the source with a frequency consistent with accepted medical practice…" § 404.1502.

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more

15

weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

The ALJ gave Dr. Violet's opinion that Plaintiff could perform less than sedentary work little weight because it was based solely on Plaintiff's subjective claims and was inconsistent with the record. (Tr. 74). The ALJ specifically discussed Plaintiff's lung impairments, the only objective medical condition cited in Dr. Violet's opinion, and noted her conclusions were inconsistent with other evidence that showed Plaintiff's lungs were normal. (Tr. 71, 73, 398, 737, 766). Further, even Dr. Violet had indicated that her restrictions were based on Plaintiff's self-reports and not on any objective findings, and thus, the ALJ was correct in finding the restrictions unsupported. (Tr. 767). A treating physician's opinion is not entitled to controlling weight when it lacks an objective basis. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). In this case, it is clear that Dr. Violet did not have objective evidence to support her

physical restrictions and thus, the ALJ gave good reasons for the little weight. § 404.1527(c)(3). *See also White v. Comm'r of Soc. Sec.,* 572 F.3d 272, 286 (6th Cir. 2009) (conclusory statements from physicians, without support from specific documents, is a valid reason for discounting an opinion).

Additionally, both parties argued extensively regarding Dr. Violet's comment regarding Plaintiff's entitlement to disability. (Tr. 767; Doc. 17, at 12; Doc. 20, at 11; Doc. 21, at 2). However, this Court finds the comment to be irrelevant when considered in both the entirety of the statement and the record as a whole. Regardless of the meaning of the comment, the ALJ had substantial evidence to conclude Dr. Violet's opinion was entitled to little weight.

*Non-Treating Sources*

Although the opinions of the non-treating sources are not entitled to any deference, an ALJ is still required to consider and determine the weight of these opinions. §§ 416.902, 416.927. The factors for determining the weight of non-treating source opinions are the same as those listed above; as well any fact "which tend[s] to support or contradict the opinion". § 404.1527(c).

Plaintiff primarily takes issue with the ALJ's reasoning that because Dr. Duncan saw Plaintiff only one time, her opinion was vague, and it adopted the subjective restrictions of Plaintiff; her opinion was entitled to little weight. (Tr. 74). Plaintiff argues it was improper for the ALJ to discredit this opinion based on the adoption of Plaintiff's complaints, however this is not so. (Doc. 17, at 12). An ALJ is entitled to examine the supportability of an opinion. Here, the medical evidence does not support the stringent physical limitations. In fact, the ALJ noted the inconsistencies in Dr. Duncan's own examination such as Plaintiff had normal strength and range of motion in all areas and only mild obstruction displayed in a pulmonary function test. (Tr. 71-

72, 591-94, 601-03). Further, the ALJ specifically stated Dr. Duncan's opinion was vague (Tr. 74). Therefore, it was not improper for the ALJ to discount the opinion because it lacked thorough explanation or documentary support. § 404.1527(c)(3); *White,* 572 F.3d at 286.

Plaintiff also appears to contest the ALJ's decision to give some weight to the consultative opinion of psychologist E.M. Bard. (Tr. 75). The ALJ stated his opinion was given less weight because he only saw Plaintiff one time and it was inconsistent with other record evidence and Plaintiff's presentation during the hearing. (Tr. 75). The ALJ discussed the inconsistent evidence, particularly intact cognition, a GAF score of 51, reports of daily activities, and specifically cites to Dr. Bard's suggestion that Plaintiff may be exaggerating the severity of his symptoms. (*See* Tr. 72-73, 518, 612). The ALJ clearly considered Dr. Bard's opinion and the other available evidence and thus, he did not commit error.

*Non-Examining Sources*

Plaintiff alleges the ALJ erred because he gave significant weight Drs. Green and Manos and some weight to Drs. Voyten and Seleshi, the state agency examiners. However, "the opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight." *Douglas v. Comm'r of Soc. Sec.*, 832 F.Supp. 2d 813, 823-24 (S.D. Ohio 2011). This occurs because the Commissioner views such medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." *Id.*; § 416.927(d),(f); SSR 96–6p at *2–3.  "Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization." *Douglas*, 832 F.Supp. 2d at 823-24.

Beginning with Drs. Green and Manos, the ALJ noted their opinions cited liberally to the

record and were largely consistent with Plaintiff's "essentially benign physical examinations". (Tr. 74). Plaintiff alleges the three occasions cited by the ALJ as examples of benign physical findings were not representative of his condition (Tr. 616, 697, 700) however, the ALJ discusses a multitude of other minimal or normal physical findings in his opinion. (*See* Tr. 70-71, 398, 432, 601, 737, 766). The ALJ adequately evaluated Drs. Green and Manos's opinions finding them to be consistent with relatively normal findings in the record and thus, he did not err by giving them significant weight.

The ALJ accorded some weight to the opinions of Drs. Voyten and Seleshi because he believed that Plaintiff needed more restrictions in the area of social interaction than they had allowed for. (Tr. 74-75). He specifically stated that Plaintiff's presentation at the hearing, consistent reporting of social aversion, and a desire to resolve doubts in Plaintiff's favor all led him to create additional limitations. (Tr. 75). The ALJ is not bound by the limitations submitted in medical opinions and is free to make his determinations based on the entire record thus, the ALJ did not err in only giving some weight to these opinions. *See Schuler v. Comm'r of Soc. Sec.*, 109 F.App'x 97, 101 (6th Cir. 2004).

*"Other Source" Opinion*

Plaintiff alleges the ALJ failed to give proper weight to the "other source" evidence provided by Blaine Muehlbauer.  (Doc. 17, at 13). As a professional counselor, Mr. Muehlbauer is classified as an "other source" under the regulations. 20 C.F.R. § 404.1513(d)(1).

The regulations provide specific criteria for evaluating medical opinions from "acceptable medical sources"; however, they do not explicitly address how to consider opinions and evidence from "other sources", including "non-medical sources" listed in §§ 404.1513(d) and 416.913(d). SSR 06-3p clarifies opinions from other sources "are important and should be

evaluated on key issues such as impairment severity and functional effects." SSR 06-3p, 2006 WL 2329939, at *3 (Aug. 9, 2006). SSR 06-3p also states other sources should be evaluated under the factors applicable to opinions from "acceptable medical sources" – i.e., how long the source has known and how frequently the source has seen the individual; consistency with the record evidence; specialty or area of expertise; how well the source explains the opinion; supportability; and any other factors that tend to support or refute the opinion. SSR 06-3p; 20 C.F.R. § 404.1527(d)(2).

In the Sixth Circuit, "an ALJ has discretion to determine the proper weight to accord opinions from 'other sources'". *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). While the ALJ "does not have a heightened duty of articulation when addressing opinions issued by 'other sources', the ALJ must nevertheless "consider" those opinions. *Hatley v. Comm'r of Soc. Sec.*, 2014 WL 3670078 (N.D. Ohio); *see also Brewer v. Astrue*, 2012 WL 262632, at *10 (N.D. Ohio 2012) ("SSR 06-3p does not include an express requirement for a certain level of analysis that must be included in the decision of the ALJ regarding the weight or credibility of opinion evidence from 'other sources.'").

The ALJ considered Mr. Muehlbauer's reports and gave them little weight because they were inconsistent with the record. (Tr. 75). Although Mr. Muehlbauer had a continual, long-lasting relationship with Plaintiff, that alone does not entitle his other source opinion to any special deference. *See Marrero v. Comm'r of Soc. Sec.*, 2012 WL 7767583, at *10 (N.D. Ohio) (finding an ALJ can limit "other source" opinion weights even when the "other source" provides a longitudinal picture of Plaintiff's condition). Here, the ALJ specifically noted Mr. Muehlbauer's opinions were not consistent with "the largely benign mental status examinations" in the record, made conclusions reserved for the ALJ, and were inconsistent with Plaintiff's

social relationships. (Tr. 75, 611, 612, 621, 705). It is clear from the opinion that the ALJ considered the medical evidence of intact cognition as well as Plaintiff's regular social contact in discrediting Mr. Muehlbauer's opinion. (Tr. 72-73, 75, 518, 529, 534, 538, 547, 557, 562, 569, 572, 575, 577, 621, 690, 705, 710, 712, 719, 726). The ALJ was not required to perform an exhaustive analysis of the "other source" opinion especially when, as here, the ALJ identified certain factors to discredit the opinion. *See Brewer,* 2012 WL 262632, at *10.

Even though the ALJ found Mr. Muehlbauer's opinion inconsistent with the record, the RFC determination is consistent, though not as restrictive, with Mr. Muehlbauer's opinion; for example Plaintiff was restricted to performing simple, routine tasks in a static, low stress work environment with only occasional social interaction. (Tr. 69, 733-34). It is evident the ALJ met his requirement to evaluate "other source" evidence and had substantial evidence to not accept it as the basis for the mental RFC.

### *Credibility*

Plaintiff argues the ALJ''s findings that he exaggerated his symptoms and was focused on getting disability are not supported by substantial evidence. (Doc. 17, at 15). When a claimant's statements about symptoms are not substantiated by objective medical evidence, the ALJ must make a finding regarding the credibility of the statements based on a consideration of the entire record. SSR 96-7p, 1996 WL 374186, *1.

An ALJ is not bound to accept as credible Plaintiff's testimony regarding symptoms. *Cohen v. Sec'y of Dep't of Health & Human Servs.*, 964 F.2d 524, 529 (6th Cir. 1992). Analysis of alleged disabling symptoms turns on credibility. *See Hickey-Haynes v. Barnhart*, 116 F. App'x 718, 726-27 (6th Cir. 2004). "Because of their subjective characteristics and the absence of any reliable techniques for measurement, symptoms are difficult to prove, disprove, or

quantify." SSR 82-58, 1982 WL 31378, *1. In evaluating credibility an ALJ considers certain factors:

> (i) [A claimant's] daily activities;
>
> (ii) The location, duration, frequency, and intensity of [a claimant's] pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or ha[s] taken to alleviate your pain or other symptoms;
>
> (v) Treatment, other than medication, [a claimant] receive[s] or ha[s] received for relief of [Plaintiff's] pain or other symptoms;
>
> (vi) Any measures [Plaintiff] use or ha[s] used to relieve [a claimant's] pain or other symptoms; and
>
> (vii) Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 416.929(c)(3).

Ultimately, it is for the ALJ, not the reviewing court, to judge the credibility of a claimant's statements. *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (ALJ's credibility determination accorded "great weight"). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). The Court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [claimant's testimony] are reasonable and supported by substantial evidence in the record." *Jones*, 336 F.3d at 476. The Court may not "try the case de novo, nor resolve conflicts in evidence . . . " *Gaffney v. Bowen*, 825 F.2d 98, 100 (6th Cir. 1987).

Here, the ALJ noted multiple inconsistencies between Plaintiff's complaints and the evidence of both daily living and medical impairments, for example he had normal pulmonary

function tests, multiple instances of intact cognition and judgment, ability to attend to his own hygiene, and regular socialization with others. (*See e.g.,* Tr. 70-73, 323-41, 385, 393, 432, 518, 547, 613). The ALJ also noted instances where Plaintiff's own doctors questioned his symptom severity or credibility. (Tr. 73, 385, 432, 534, 613). Lastly, the ALJ observed Plaintiff apparently had preoccupation with receiving benefits as it was mentioned in multiple visits with various medical professionals over the course of many years. (*See* Tr. 74, 448, 613, 690, 750).

While it is true, as Plaintiff argues, that an ALJ may not cherry-pick evidence to support a conclusion on credibility, it is evident here that the record supports the ALJ's decision. Furthermore, even if the Court were to construe the evidence as Plaintiff contends, substantial evidence exists to support the findings made by the ALJ and thus the Court will not overturn them. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). From a review of the opinion and the record, the ALJ had substantial evidence to support his conclusion that Plaintiff was not entirely credible.

### Step Five

Plaintiff alleges the ALJ did not accurately convey his limitations in the hypothetical given to the VE. (Doc. 17, at 18). In order for a VE's testimony in response to a hypothetical question to serve as substantial evidence for the conclusion a claimant can perform other work, the hypothetical must accurately portray a claimant's physical and mental impairments. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010). "It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact." *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

Here, the ALJ formed multiple hypotheticals, each one more restrictive than the last. (Tr.

117-20). The hypotheticals appropriately accounted for the symptoms and impairments the ALJ believed credible, and even some of those based solely on Plaintiff's subjective complaints; such as the hearing restrictions. (Tr. 69, 616). Similarly, the mental limitations were based on objective evidence like the GAF score, examination notes, and activities of daily living, all of which suggest the ability to work. (*See* Tr. 94, 327, 518, 537, 612-14). The ALJ adequately provided for the credible and supportable mental and physical impairments in his work restrictions, which in some cases were more restrictive than the medical opinions. (Tr. 69, 72-73). The Court has already found the ALJ did not err in the weight given to the medical opinions and thus, the ALJ's reliance upon them in making his RFC was not in error. Because the hypothetical was based upon medical evidence in the record and the limitations the ALJ found credible, the VE's testimony is substantial evidence upon which the ALJ can rely.

### CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI is supported by substantial evidence, and therefore the Commissioner's decision is affirmed.


   s/James R. Knepp II
United States Magistrate Judge